619 P.2d 581 (1980)
95 N.M. 136
In the Matter of the Protest of A. J. BLACK and Mary Jane Black, his wife, and Alameda Air Park, Inc., Appellants,
v.
BERNALILLO COUNTY VALUATION PROTESTS BOARD and County Assessor for the County of Bernalillo, New Mexico, Appellees. and
In the Matter of the Protest of June BLACK, Appellant,
v.
BERNALILLO COUNTY VALUATION PROTESTS BOARD and County Assessor for the County of Bernalillo, New Mexico, Appellees.
Nos. 4597/4591.
Court of Appeals of New Mexico.
October 23, 1980.
*583 Arthur O. Beach, Keleher & McLeod, Albuquerque, for appellant June Black.
John P. Salazar, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, for appellants A.J. Black, Mary Jane Black and Alameda Air Park, Inc.
Joe C. Diaz, Bernalillo County Atty., Kenneth A. Hunt, Albuquerque, for appellees.

OPINION
SUTIN, Judge.
This is an appeal by property owners (The Black family) from a series of decisions and orders of the Bernalillo County Valuation Protests Board (The Board). The Black family filed fifteen separate protests pursuant to Section 7-38-24, N.M.S.A. 1978. Six of the tracts are assessed in the name of June Black, and nine are assessed in the names of Albert J. Black and Alameda Air Park, Inc., a Black corporation. The family protested the value of their ranch for property taxation as determined by the Bernalillo County Assessor (Assessor). The Assessor refused to assess the ranch under a special method of valuation for lands used primarily for agricultural purposes as provided in §§ 7-36-15 (methods of valuation) and 7-36-20 (special method of valuation of land), N.M.S.A. 1978. The Board affirmed and we reverse.
The Black family has owned the Seven Bar Ranch (Black Ranch) since 1929. The only change in ownership has been by inheritance. Originally, the ranch contained about 20,000 acres which began at the Rio Grande River and went west to the Rio Puerco. Over the past half century, portions of the land were condemned by Public Service Company and by County of Bernalillo. Portions of the land were withdrawn for other purposes such as the Seven Bar Airport. Some land has been sold to pay inheritance taxes. These portions were not included in the protests. No improvements were made on the tracts of land other than range fences, barns, stock tanks, wells and corrals.
Albert J. Black, a rancher and farmer, has been the manager of the ranch since 1929. He acquired the land in 1941. He has lived on the ranch for 50 years and has kept the ranching business in operation to the present time. He owns about 350 head of cattle. His son, John F. Black, owns about 35 head of cattle. All of the cattle run on the ranch. Timmons, a lessee of a portion of the land also has cattle on the leased land which graze on family land because of no fencing. Alfalfa, now, and for several years prior to 1979, has been grown on a good percentage of the ranch. The Black family has grown grass up to the height that grass seed can be obtained in areas that are not grazed and sold for reseeding purposes.
In 1977, the land of the June Black protests was leased to Timmons and used by him for farming and ranching.
*584 The ranch has no income from any source other than agriculture and the protestants have not attempted to change the zoning on any of the properties. The family intends to use the property subject to the protests for agricultural purposes as long as it is economical to do so. There has been some "planning" to protect the property in the event of condemnation; however, the planning does not evidence intent to use the property for purposes other than agricultural.
The Black family paid taxes on the property until 1979 based upon its classification as agricultural land. For that year, the Assessor denied the family's application.
It would be inexpedient to set forth the findings of the Board in fifteen decisions and orders. We shall set forth those findings accumulated from various decisions which we find to be erroneous because made arbitrarily and capriciously by the Board. The Board found.
(1) The property owner did not apply for a special valuation based upon any agricultural use other than grazing.
(2) On January 1, 1979, grazing use of the subject property is subordinate to another use or purpose of the owner.
(3) The property owner failed to present competent evidence which met or overcame the statutory presumption which favors valuations as determined by the Bernalillo County Assessor.
(4) The subject property is, and was on January 1, 1979, contained within a large piece of property known as the Seven Bar Ranch.
(5) While it appears that the property owner grazes cattle on the Seven Bar Ranch, there was insufficient evidence presented from which it could be determined that the subject property was used primarily for grazing purposes on January 1, 1979.
(6) On January 1, 1979, the land was being held by the property owner primarily for speculation, and any agricultural use was incidental to such primary use.
(7) Any agricultural use of the subject property on January 1, 1979, was subordinate to another use or purpose of the owner.
(8) The subject land is adjacent to a shopping center and residential development.
The sole issue on this appeal is:
For the year 1978 [the preceding year] were the protested portions of the Black family ranch used primarily for agricultural use? The answer is "yes."

A. The Board's findings are not supported by substantial evidence.

The test is whether the Black family met its burden of proof fixed by § 7-36-20(A) & (B) as follows:
A... . The burden of demonstrating primary agricultural use is on the owner of the land, and he must produce objective evidence of bona fide agricultural use for the year preceding the year in which application is made for his land to be valued under this section. The fact that land was devoted to agricultural use in the preceding year is not of itself sufficient evidence to support a finding of bona fide primary agricultural use when there is evidence that the agricultural use was subordinate to another use or purpose of the owner, such as holding for speculative land subdivision and sale, commercial use of a nonagricultural character, recreational use or other nonagricultural purpose. [Emphasis added.]
B. For the purpose of this section, "agricultural use" means the use of land for production of plants .. . livestock... .
We note that "alfalfa" is a deep-rooted European Leguminous plant, and "grass seed" is a propagative plant structure, and "cattle" are livestock.
The only testimony presented at the Board hearing was that of John F. Black, the son of Albert J. Black. As heretofore set out, his testimony established that the ranch was used primarily for agricultural use. The burden shifted to the Assessor. No evidence was introduced that the lands described in the tax protests were used in *585 the year preceding January 1, 1979, or for that matter, in any year since 1929, for any purpose other than grazing cattle, growing alfalfa or harvesting grass seed. The Assessor had not even inspected the property and was without information relating to it. The colloquy between Lane, the Appraisal Supervisor for the Assessor, and Keleher, the attorney representing June Black, was as follows:
MR. KELEHER: Thank you, sir. We would first ask that the assessor's office state briefly why the exemptions were denied.
MR. LANE: The exemptions were denied because according to the statutes people must claim these exemptions every year, and in going over the request for the exemptions it was found that for many years there had been no determination as to the facts of the actual use of the land. There has also been a great deal of change in the usage of the lands in this general area or, as a matter of fact, in all of Bernalillo County during the last few years. Upon a visual determination of no cattle being observed upon the land it was determined to deny the exemption and have the property owner come in and support the burden of proving to us that the land was, in fact, continuing use for grazing purposes and for agricultural purposes. There was no one particular property owner picked out as an example.
MR. KELEHER: There was an actual inspection of the lands that are the subject matter of this proceeding in order to make a determination that there were no cattle on these lands or was that just generically true of the northern portion of the county?
MR. LANE: That was just true of the northern portion of the county that there has been either no cattle observed, fences not maintained or some indication that would give us doubts that agricultural use had been abandoned on these properties.
MR. KELEHER: There was no specific information relating to this property that you personally are aware of at this time?

MR. LANE: There was no specific information, no. [Emphasis added.]
There is no substantial evidence to support any of the Board's findings. The only reason for denying the Black family's applications for an agricultural use of the ranch was to put the family to the test of proving that the land was used for agricultural purposes. A capricious denial is not within the scope of the Assessor's duties. The County Assessor is required to determine the value of property for taxation purposes. Section 7-36-16, N.M.S.A. 1978. When an appraiser raised the value of the property because the values were too low, we said that the decision of the Bernalillo County Valuation Protests Board was arbitrary and capricious. San Pedro So. Group v. Bernalillo Cty. Val. Pr. Bd., 89 N.M. 784, 558 P.2d 53 (Ct.App. 1976). "What is most important is that the appraisers, the assessor and the protest board exercise an honest judgment based upon the information they possess or are able to acquire." First Nat. Bank v. Bernalillo Cty. Valuation, 90 N.M. 110, 114, 560 P.2d 174 (Ct.App. 1977). It is in this spirit that the Assessor should effect a change from agricultural use to nonagricultural use of land.
We are mindful of the pronouncement of the Supreme Court concerning the special method of valuation for agriculture in County of Bernalillo v. Ambell, 94 N.M. 395, 611 P.2d 218 (1980). It said:
... This "Green Belt" law is clearly an exception to the general mode of property valuation for tax purposes... . It is clear that the legislative intent behind this special method of property valuation is to aid the small subsistence farmers in our state... .
It does not affect the substantial evidence rule.

B. There are no applicable presumptions which favor the Assessor's valuations.

The "presumption" doctrine of § 7-38-6 relied on by the Assessor is not applicable. It reads:

*586 Values of property for property taxation purposes determined by ... the county assessor are presumed to be correct.
We are not concerned with the value of the ranch for property taxation purposes. Rather, the protests address the question of whether the Black family is entitled to the special method of valuation provided for in § 7-36-20. This method of valuation mandates that the value of land be determined on the basis of the land's capacity to produce agricultural products. The "presumption" doctrine set forth in § 7-38-6 is not applicable. See generally, Ambell, supra.
Section 7-36-20(C) reads:
The department shall adopt regulations for determining whether or not land is used primarily for agricultural purposes.
P.T.D Regulation 29-9:1(c) provides in pertinent part:
A presumption exists that land is not "used primarily for agricultural purposes" if income from a nonagricultural use of the land exceeds income from an agricultural use of the land.
Although we question the authority of the Department to create presumptions of fact by way of regulations, we do not decide the issue because the "presumption" is not applicable to the facts in this case. There is no income from a nonagricultural use of the land.

C. Taxpayers are not bound by their application for special valuation based on "grazing."

The Assessor argues that in applications presented all of the parcels were claimed to have been used for grazing; that five of the tracts were not used for grazing but were used for "agricultural use." Therefore, the Assessor says, "The assessors' contention is that the taxpayers are bound by an election as to grazing use." We disagree. A determination of agricultural use is not made by a technical oversight of an applicant made in a protest; it is determined by the evidence presented at the hearing. With reference to "Grazing Land," P.T.D. Regulation 29-9:4D reads in pertinent part:
... The Department shall by order made after Department investigation, determine annually the carrying capacity of each class of grazing land by determining the number of animal units per section that the grazing land will reasonably support... . [Emphasis added.]
If any such investigation was made, which we seriously doubt, it was not presented by the Assessor. In this appeal, the Assessor uses a technical approach to defeat the Black family case.
As to the parcels on which grazing did not take place, the Assessor contends that the exact legal descriptions of the area harvested, the amount of harvesting in 1978, and any income from such harvesting was never presented to the Board. The Assessor argues that the logical conclusion is that "if an entire parcel is not being used for agricultural purposes, only the portion actually being so used is subject to special valuation." Mackle Co. v. Metropolitan Dade County, 220 So.2d 422 (3d D.C.A.Fla. 1969). In Mackle Company the 320 acres of land involved was divided evenly, one-half being used for agricultural purposes and the other half not.
The Black family ranch is not divided in this fashion. It is divided into fifteen different parcels, each used for plants or livestock or both. We view the entire parcel with reference to a special method of taxation, not as fifteen separate tracts of land. It is all owned in one family through inheritance and, in effect, it was so tried before the Board. This method of taxation was acceptable by the assessor until the year 1979. It was changed without investigation and affirmed by the Board. We cannot condone the arbitrary and capricious conduct of the Assessor in adopting a wrong method of valuation or the conduct of the Board in affirming the action of the Assessor.

D. The Board is a quasi-judicial body subject to the supervision of this Court.

The Board is a quasi-judicial body. Although the Assessor and property *587 owners are adversaries, a protest hearing should not be viewed as an adversary proceeding with the Board arrayed against the taxpayer. When a taxpayer makes a prima facie case that a ranch is used primarily for agricultural purposes and the Assessor remains silent in the presentation of evidence, the duty of the Board, like that of the Court, is to take a "hard look" at the facts and the law to arrive at a result. Taxes are the sinews of the state and taxpayers are the people who sustain its operation and its political subdivisions. The Board was not created for the purpose of burdening the people. Its duty is to protect taxpayers from appraisers and county assessors who are delinquent in the performance of their work.
It would appear from previous opinions of this Court that we have been put in the position of supervising the performance of boards in exercising responsibilities, that the legislature conferred in the broadest terms. Gardner, The Administrative Process in Legal Institutions, Today and Tomorrow (Paulsen ed., 1959, pp. 108-148) said:
"[J]udicial review is by far the most significant safeguard against administrative excess which can be contrived ... [it leads to a closer attention to the facts, to the reasons given,] and to the statutory words which are used to support the agency's action." [138-39.]
In Greater Boston Television Corporation v. F.C.C., 444 F.2d 841, 851 (D.C.App. 1970), Judge Leventhal, one of the recognized authorities in administrative law, said:
Its supervisory function calls on the court to intervene not merely in case of procedural inadequacies, or bypassing of the mandate in the legislative charter, but more broadly if the court becomes aware, especially from a combination of danger signals, that the agency has not really taken a "hard look" at the salient problems, and has not genuinely engaged in reasoned decision-making.
All of the Decisions and Orders of the Board are reversed. They are arbitrary, capricious and not according to law. Matter of Protest of Miller, 88 N.M. 492, 542 P.2d 1182 (Ct.App. 1975). We hold that for the year preceding the year in which the applications were made for the lands to be valued, the lands were used primarily for agricultural use and are subject to this special method of taxation.
Costs are assessed against the Board.
IT IS SO ORDERED.
HERNANDEZ, J., concurring in result.
WALTERS, J., dissenting in part, concurring in part.
WALTERS, Judge, dissenting in part, concurring in part.
With the exception of the parcel covered by Protest No. 610, I concur in the majority opinion holding all parcels taxable as land used primarily for agricultural purposes. I withhold concurrence on that one parcel because the single witness for the protestants testified that only one-third of that piece of land was put to agricultural use. Section 7-36-20A requires production of "objective evidence" of "primary agricultural use" during the preceding year. The parcel was identified as land adjoining the air park. In my opinion, evidence that one-third of that parcel carried native grasses is not evidence that it was "used primarily for agricultural purposes." I would affirm the Board on that assessment.
I cannot agree, either, that denial of the applications for valuation of the land as agricultural property was capricious. The assessor did not see any cattle on the properties of any taxpayers in the vicinity of and including the lands in question and he observed fences in disrepair, which indicated to him that the grazing uses claimed in the applications for special valuation were not substantiated. I would agree that the Board was capricious in denying all of the protests thereafter filed, in view of the evidence produced, but I am unwilling to suggest that the assessor did not make an honest judgment based on his observations of land use in the locality, or that there was any impropriety in putting the protestants to the proofs of their entitlement to a special valuation method.